Ms. Rubin, whenever you're ready. Good morning. May it please the court, my name is Annette Rubin. I represent Brennell Harris in this case. This was a case where summary judgment was granted in favor of the defendant in the court below. This is a case arising under the Americans with Disabilities Act and specifically a case arising under the safe harbor provisions of the ADA that are found in 42 U.S.C. 12114. Those provisions do provide a safe harbor for people who have in their past and who are erroneously perceived as using illegal drugs, but who are not. Brennell Harris can't change what's in her past, but the law says that she is entitled to equal opportunity of employment, the same as everyone else, despite this history and despite this perception and despite the toxicity associated with those two things. So the question before this court is, did the defendant fire Ms. Harris because she engaged in misconduct on August 11, came to work under the influence of alcohol and drugs? Did they fire her as a direct threat to their workplace and rightfully so, that's their defense. Or, did Ms. Harris, having had this in her past, continue to bear the prejudice of this and this is a woman who came back to work too quickly after a concussion, who had a fainting episode at work and who was immediately assumed to be engaged in inappropriate alcohol and drug use? Didn't she admit that morning that she had had alcohol and taken certain drugs? No. And I would direct the court to the appendix at page 185 and 184. Well, they actually tested her and it came up negative. So how do you explain her bizarre behavior on that day? I have a medical opinion that explains that behavior. She had been, had an accident at her house, took a header into a set of cement steps, cement steps, had a serious head injury. They ran an MRI at the hospital. She was having altered mental status at that point. They ran a toxicology test at the hospital because they didn't know what the cause of this was. I'm very sorry to interrupt you. Please forgive me. Could you give me the record site again? Yes, ma'am. It's joint appendix at 185. And I'm sorry. Please go ahead. I apologize for interrupting you. There's a couple of things about these admissions. Number one, what she admitted to and what we find out in discovery is the list of things that's quoted at 184 plus at most two glasses of wine within the past 24 hours. Is the JA 185 that you directed as Tuesday's reported to work on August 11, 2009? Visibly impaired, admitted to taking large quantities of tranquilizer type medications and alcohol prior to start of shift. Yes. Was unable to safely perform the duty. And that is a record of what the defendant's perception was at the time. But the actual... But that's not a perception. It says she admitted to taking large quantities of tranquilizers and apparently having two to three glasses of wine and taking the drugs Cymbalta, Klonopin, Ambien, Tylenol and another one. That wasn't their perception. That was a perception. They had done so. With all due respect, Your Honor, I beg to differ. She said that she had two glasses of wine with lunch the day before. How that translates into large quantities of alcohol prior to start of shift, I'll never know. But... She said... And there was a zero alcohol found in her system. So where in the record does it say the two glasses of wine at lunch the day before? That would be... That sounds sort of familiar. Certainly the defendant acknowledged that. There was some dispute about whether it was two at lunch the day before or two at midnight and one at 630 in the morning. The plaintiff's testimony is that it was two the day before. Was she not... Wasn't she on a program that prohibited her from drinking? Wasn't she on a... Am I misremembering that? Wasn't she restricted in terms of her alcohol and drug intake? No, actually. She had completed that program in June and in fact she had just come off six years of once a week testing for which there's no... In the record, no bad result. In the record. She had a... She did have a relapse at some point that's in the record. She had an episode in 2007 where she was given a prescription for Lunesta, the same Lunesta we see on TV. One of her treating physicians gave her a prescription for Lunesta in 2007. That was a violation of the HPIP contract. She wound up taking an FMLA leave on that. There was no discipline associated with that. There was no misconduct associated with that. And I would like to find the part in the record where she describes the two glasses of wine and I have it here. The issue before the court is summary judgment whether there was any evidence where this court or the court below, pardon me, would have found that she was perceived as a person who had a drug and alcohol problem. She was terminated under circumstances raising an inference. Was there any pretext? They're asserting a direct threat defense. There's lots of evidence for all of this. The court below erroneously limited the plaintiff's evidence to a single statement which actually limited improperly that exact statement. But wasn't it later discovered that she had administered medication to patients in a state in which she was clearly not fully aware of her surroundings or what she was doing? Yes. Was not responding to patients' calls for assistance? Yes. She was having a fainting episode at work and her doctor offers a medical opinion that says this is typical of post-concussion syndrome. As her working diagnosis, her doctor diagnosed her with a grade 3 concussion and talked very specifically about how post-concussion syndrome causes a lot of problems for people. A woozy episode, a fainting episode, amnesia, all kinds of stuff are readily associated with post-concussion syndrome. In fact, there's any number of reasons why a person might become woozy. But regardless of the reason, how could she function, how could she perform the functions of her job in that state regardless of what caused her, what brought her to that state? And that goes right to the direct defense, Your Honor, or the direct threat defense. This is a hospital that doesn't fire people for becoming incapacitated at work and you have to leave. This isn't a hospital that disciplines people for no call, no show because they're in the hospital with a traumatic head injury. I'm sorry, if I may reorient to the judge's question. They're saying that this is an ongoing condition. My client no more suggests that she should be allowed to continue working with an untreated concussion than if she was having a stroke or a heart attack, which, by the way, she could have been for all they knew because they didn't ask her any questions. What they said was, you're drunk. Okay, I'm not sure I continue to understand your ADA argument. What are you saying is the problem? How is she subjected to disability discrimination? Because she was treated as a person who was engaged in the illegal use of drugs when she was not. That's the statute I cited at 42 U.S.C. 12114, which talks about being erroneously regarded as engaging in such use but not engaging in such use, having successfully completed a drug rehabilitation program and not engaging in such use. She was told that she was drunk. Yes. And she acknowledged that she had been drinking at some point during the prior day for 24 hours and apparently was taking some kind of medication. She acknowledged two glasses of wine the previous day. The toxicology report tested for alcohol. It came back negative. The drugs that she was taking, that's actually interesting because what's missing is any evidence that any of those drugs would have caused any level of impairment at all. That's her regular prescription stuff, according to her doctor. What's more is none of that was in the toxicology report.  So the lower court cited these reasons, her lack of consistency in assisting her peers and had full written warnings for medication violations, suspension for a no-call, no-show on August 4th, and then troubling behavior on August the 11th. Yes, Your Honor, and going back to 185 at the joint appendix, what they fired her for was misconduct on August 11th. They said, you came to work impaired from drugs and alcohol. You're fired. The problem is that they ran a toxicology report, and she didn't have anything except Tylenol come up in the report. The first thing they said about that was unable to safely perform her duty, and you're fired. And what we're saying is that the hospital has no history of firing people who have a fainting spell and becoming incapacitated at work. But she had a record that Judge Floyd just alluded to of performing acts that could have subjected the hospital to a lawsuit for improper patient care. The medication errors? Or the events of August 11th? All right, let's pick the medication errors. There was a laundry list. There was four instances of medication errors between a relatively short period of time. Yes, during a period when she was still in the HPIP program and testing negative still for drugs and alcohol, and Nancy Sesko says that it's unusual for there to be more than one or two at a time and that anybody who commits a medication error, and it's a big health care facility, they get written up. They didn't fire her for accumulation of medication errors. They fired her for misconduct on August 11th, and that perception and the reason they fired her is written out at JA 185. They're saying you came to work admitting to drugs and alcohol, and you were apparently impaired by that. You're fired. You're a continuing threat. We can't have you. And what my client says is that she has this in her past, but she has a clean toxicology report that they took that day, which they initially misrepresented, by the way. They initially said that this toxicology report is limited to alcohol and narcotics, which it didn't find alcohol anyway, and it turns out this is a thorough, complete, comprehensive toxicology report that had she had anything in her system, it would have showed up, and what it showed was Tylenol because that's all she had in her system. That is the central fact of this case. I know perfectly well, if I may conclude. If you could finish. Yes, ma'am. I know perfectly well I wouldn't be standing here making this argument if my client had failed that drug test, but she didn't. There's no evidence that she did what they accused her of doing that day, and their accusation is based on nothing but their perception. There's no history of firing people. I see that I am concluded. Thank you very much. Yes. Thank you very much. You have some time on rebuttal. Yes, ma'am. Good morning, and may it please the Court. I'm Sarah Belger. I represent Apelli Reston Hospital in this case. The District Court properly granted summary judgment on behalf of Reston Hospital for multiple reasons, and I think Your Honors have pointed out one of the major reasons, and that is because Ms. Harris could not perform the essential functions of her job on August 11, 2009. She admitted as much in her deposition testimony. As the Court is aware, in a prima facie case of disability discrimination, a plaintiff must show that... Sorry, you said she admitted as much in her deposition testimony. Do you have the JA site for that? I do. I do. It's JA 84 and then also JA 109-110. The question was, do you think that you could safely administer medication when you were in that state on August 11? The answer, when that wave happened upon me, no. Question, do you think that you were able to treat patients when that wave came upon you on August 11? Answer, no. Question, when you were meeting with the folks at Reston Hospital in the conference room on the 11th, did you ask for any type of time off or sick leave? Answer, no. Through her concession that she could not... Did you tell them whether you had had any glasses of wine in the 24 hours? Is that the reference to the wine issue? The reference to the wine, Your Honor, is... I have the JA site for that as well. JA 116-118. Ms. Harris had admitted that she had had at least two glasses of wine in the 24 hours before her shift. She also admitted that she was on multiple medications at the time that she showed up for her shift on August 11, 2009. That's JA site 77-78. She admitted that she was taking Klonopin, Cymbalta, and Ambien. And in addition, on her drug test consent form, which is JA 184, she signed it. There was no question that she was the one who signed this consent form. She said, I am taking the following prescribed or over-the-counter medications at this time, and she listed Cymbalta, Klonazepam, which is another word for Klonopin, Tylenol 500, Mexotrexate, and Ambien. And additionally, I wanted to point out that on the termination form that counsel for Ms. Harris referenced in her argument at page 145, the hospital, the undisputed testimony is that the hospital took into account both her state on August 11, 2009 and her inability to treat patients, but also they took into account her previous performance documented deficiencies. And that's on 185. It explains how, you know, has any action been taken in the last 12 months, and it lists them. There was a performance corrective counseling memo on August, I'm sorry, October 24, 2008. That was documenting the four medication occurrences that Ms. Harris had in 2008 over a six-month time period. One of them was for not giving a medication to a patient for 11 hours beyond when the doctor had prescribed it. Another one of the occurrences was giving a patient twice the amount of dose that he or she was supposed to receive. Another documented performance medication occurrence was for skipping a dose and Ms. Harris not catching the skipping of the dose. That is listed on the corrective counseling termination notice and also her suspension on August 4, 2009 for the no-call no-show. Her supervisor, Nancy Sesco, who is the director of the surgical unit, testified that she took into account all of those things in the decision to terminate her, in addition to the three years' worth of performance assessments where she was continually counseled to help out her peers better, that she needed to improve on that score. And the testimony on that was undisputed. But if I may, I would just like to point out on August 4th, she was under the record hospitalized for some reason. But it is undisputed in the record that at that point Reston Hospital did not know that she may have been suffering a concussion. The only thing that was in the record is that Ms. Harris testified that she believed she told Ms. Sesco on August 5th that she had fallen and gone to the hospital and hit her head, which does not mean that the hospital then automatically should know or assume that there's any kind of concussion that has been diagnosed. And in addition, Ms. Harris did not come back to work on August 11th with any kind of work restrictions or requests for any accommodations. She didn't tell anybody that she wasn't feeling well. She didn't do anything to put Reston Hospital on notice that she was having some sort of medical emergency, as Ms. Harris' counsel argues today. It is undisputed on August 11th that several hospital employees witnessed Ms. Harris slurring her words, speaking slowly, not responding to at least two patient calls for assistance, staring blankly at a computer screen for several minutes while the screensaver was on, and standing and staring blankly while at the nurse's station. It is also undisputed that she had administered medications to patients before people had noticed that she was acting in a strange manner and before she was taken off the floor. The Reston Hospital rightfully concluded that they just couldn't allow her to perform her duties and she wasn't safely performing her job. I would like to note a couple of other arguments that counsel makes in her brief. Ms. Harris had admitted to violating policy back in 2003 for diverting Dilaudid from a Reston Hospital pain pump. Reston Hospital could have terminated her employment at that point. There's no question that it was a violation of hospital policy. Instead, the hospital chose to allow her to continue working there as long as she completed the requirements of the HPIP program. And the HPIP program is administered by the State of Virginia in order to allow health care providers to keep their jobs and to keep their medical licenses and nursing licenses. And as part of that HPIP program, Ms. Harris could not administer narcotics to patients for several months when she returned from a six-month leave in 2004. Obviously, as a surgical nurse on a surgical unit, administering narcotics is a major job function, but the hospital still chose to accommodate her by having somebody else administer the medications to her patients. In 2007, Ms. Harris obtained a prescription for Lunesta, which is in the same family as Ambien. HPIP decided that that was a violation of the program and extended her period by one year. And so as Ms. Harris admitted that she was unable to perform her job duties, taking into account all of the previous performance issues that she had had over the last several years, in addition to the no-call, no-show on August 4th and the way she was acting on August 11th, Reston Hospital properly performed that she cannot establish a prima facie case of a disability and she cannot establish any evidence of pretext. Ms. Harris tries to surmount this problem by pointing to statements made in front of the Virginia Employment Commission and the Virginia Board of Nursing, and I just wanted to address those briefly. Both of those are subject to a state statute that prohibits statements made during those proceedings to be used in a later court of law or administrative proceeding. So the statements that were made during those hearings cannot be used now. That being said, even if you were to use them now, it doesn't establish anything, which is the critical fact in this case, that she admitted that she could not perform her job duties on that day. Finally, she also tries to belatedly assert that she has a record of impairment, which she is saying is separate from her argument under both the EEOC charge and her complaint that she was wrongfully perceived as having an impairment. We submit that she did not exhaust that at the EEOC stage or in her amended complaint. She brought it for the first time in her opposition to summary judgment, and we urge that it is not considered as something that she has exhausted under the ADA. However, even if you do consider that as something that she has exhausted and that is properly before the district court and then this court, we still submit that it doesn't change her theory of whether she had a record of impairment or was perceived doesn't change the insurmountable hurdle she has that she was performing at the essential functions of the job and she was qualified for her position on that day. So you're saying even if the trial judge was wrong about the results, it doesn't change the outcome? That's correct, Your Honor. I mean, I submit that the trial judge was right on that count, but even if the trial judge was wrong, you still have to show that you are a qualified individual with a disability under the ADA, whether you define disability as a physical or mental impairment that substantially limits a major life activity or separately you have a record of impairment or separately you are perceived as. Any one of those arguments that you make, you still also have to show on top of that that you were qualified for the position at issue, which she cannot hear. Am I misleading Dr. Bowers' deposition 187, 188, 189? It doesn't seem to me that he says she suffered concussion syndrome. That's correct, Your Honor. He did not. And I do want to point out, unless there's some confusion, when she went to the hospital on August 4th, it was not Reston Hospital, so it was not her employer. She went to a different hospital on that day. She was not definitively diagnosed with a concussion while she was at the hospital on August 4th. In the discharge papers at Inova Loudon Hospital, it said that she should follow up with her primary care physician to talk about her mental health and her Klonopin usage. She did not follow up with her health care provider, Dr. Bowers, until about 6 weeks later, which was after she'd already been terminated. She was terminated in August, and she went to see her primary care physician in middle of September. At that point, Dr. Bowers was relying only on her own statements to him. At that point, he testified he did not have all the records in front of him. He was relying on what she said and what she said happened to her. And he said, based on that recounting of the history, even though the exam is essentially, quote, essentially normal at this time, that he thought she may have been suffering from a concussion that was slowly resolving. He said under oath that he couldn't definitively categorize it as a concussion, even though he thought that might be what was going on based on what she told him. And for those reasons, we submit that the district court properly granted summary judgment in favor of Reston Hospital, and we ask that this court affirm that decision. Unless there are any other questions? Thank you very much. Thank you. The record with respect to the two glasses of wine is at Joint Appendix 117. It's Nancy Sesko's discussion of it. She talks about two glasses of wine at midnight, which can in no way be described as large quantity of alcohol before coming to work. And another glass of wine at 6.30 in the morning. At 6.30 a.m., which my client disputes, and that's also in the record. What she says is that she had two glasses of wine with lunch the day before. In any event, if we're talking about at most three glasses of wine in 24 hours, there's no evidence that that would impair anybody, and there's also no evidence that there was any alcohol in her system. They tested for it. It came back negative. Again, putting all that aside then, how do you respond to the fact that she admitted that she could not perform her job duties? That's the question whether we're going to assume that there was some fault. They fired her for misconduct. So we're going to – I'm sorry, how do I respond to that? She was suffering from a concussion. Reston Hospital acknowledges that you can have a woozy and fainting spell from a concussion. You can have a woozy and fainting spell from anything. And actually would counsel accidentally put her finger on it. You don't automatically know or assume. We cannot automatically assume that she had done anything wrong that day on August 11. There's no evidence that she did. The toxicology report came back clean. The toxicology report, which they initially tried to misrepresent as saying, oh, no, this was limited, it didn't test for what she was on, she was on something else. No, that is not at all true. That is not true. And indeed, using the principle of evidence, you can say that a misrepresentation about a material fact is affirmative evidence of guilt. I think the question went to regardless, just completely putting that aside. She acknowledged that she couldn't perform the functions of her job. Yes. So suppose she didn't drink at all or whatever. She had a concussion, although there's no definitive diagnosis of that in the record. What about the fact that she was having trouble doing her job and acknowledges as much? She wasn't responding to patient calls. She was staring at a screensaver. There is no dispute that she was suffering from something that day. I have a medical opinion from her treating physician carrying grade 3 concussion as a working diagnosis. That's found at the Joint Appendix Volume 2 at 373. She would not have been able to do her job if she was having a stroke. She would not have been able to do her job if she was having a heart attack. She wouldn't have been accused of drinking large amounts of alcohol and taking drugs prior to work if she had been having a stroke or a heart attack or any of the other things that Reston Hospital says. Of course an employer will expect from time to time that their employees will experience a medical emergency. I asked the 36th opponent about that. Are you aware of people who've had medical emergencies, become incapacitated, and had to leave work? Yes. Were those people fired? No. But did she ask to leave work? No, but what I'm saying is that she would not have been fired but for this history and perception. She would not have been accused of drinking and taking drugs without this history and perception. She would not have been accused of being a relapsed drug addict without this history and perception. Without this history and perception, she's sent home, a drug test is taken, and when the results come back negative, that's exculpatory. But we're pressing this still. The defendant isn't saying they were mistaken. The defendant is saying they were right. Their perception is correct. This was a woman who took a whole lot of stuff and came into work, and that's just not true. She's fired for misconduct, not for accumulation of medical errors, which there had been none in the past 10 months prior to her termination. She was not in any kind of disciplinary or performance improvement program. This is someone who had a medical issue at work, and because of the perception, she was just assumed to be drunk. We just assume that two glasses of wine the previous day makes you too drunk to do your job the next day. We just assume that the stuff she's taking is something other than her routine meds and that would cause her to be impaired. Her doctor says no. Her doctor specifically addressed the issue of the flaw in her pen. With respect to the definitive diagnosis, that was something else where the judge below preferred the defendant's version of facts to the plaintiff. Dr. Bowers was very clear that, and he's a guy who'd seen a lot of concussions, he said that the post-concussion syndrome was likely what she was suffering from, generally accepted medical practice. The definitive diagnosis issue stems from the idea that there's not a test, it doesn't show up on an MRI, there's not a chemical test that you can run that says concussion. What you do is you look at the event. She had a severe head injury. She still had a bruise on her face at this time. That's in the record. She has a big bruise on her face from when she smacked her head on a set of cement steps the week before. There's no evidence that there was anything but that going on, and yet they disbelieved her, they suspended her, and when she came back they were looking because they automatically knew. They automatically knew what it was. They had their answer. This wasn't a person who had had a serious head injury the week before and now is having a fainting spell, and that's carrying a diagnosis of grade 3 concussion, which Dr. Bowers says is generally accepted for what was described. We don't automatically assume she was on something. They're pushing that she was on something. That itself tells us what their perception is. They wrote down what their perception was. She admitted to large quantities of tranquilizers and alcohol. That's not true. That is not at all true. That's not close to being true. She said, I take this for anxiety and depression. She was taking not methotrexate, meloxicam, which is an NSAID. It's like Advil for arthritis in the hips. There's no evidence that any of that would have had any intoxicating effects at all. In fact, the evidence is that it wouldn't. Dr. Bowers specifically addresses that in the record, that it would not have been betclonibine, which is a commonly prescribed anti-anxiety drug. She was on a starter dose, and he talked about that in the record, at 349. This is such a commonly prescribed medicine. He says, I find it hard to believe that anybody would be impaired by using it. Ms. Rubin, your time has expired. Do you want to wrap up? Yes, ma'am. Thank you. I would ask that this court remand the case back for trial. Ms. Harris deserves her day in court. There's a lot of evidence that this decision was made not on the facts that were before them, but on their preconceived notions. Thank you very much.
judges: Allyson K. Duncan, Henry F. Floyd, Stephanie D. Thacker